# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Derek Walsh, Shane Mitchell, Terrell Hill,
Brian Engelsman and William Hinton,
individually and on behalf of all others
similarly situated,

       Plaintiffs,

v.

Mike Kelley, in his official capacity as
Sheriff of Will County, Illinois, and Will
County, Illinois,

       Defendants.

Case No. 17 C 5405

Hon. LaShonda A. Hunt

## MEMORANDUM OPINION AND ORDER

Plaintiffs[1] are former and current detainees at the Will County Adult Detention Facility

("WCADF"). They filed this class action against Defendants challenging restrictions on reading

materials and mail processing delays under the First Amendment and the Religious Land Use and

Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc, *et seq.* Currently before the

Court are the parties' cross motions for summary judgment. For the reasons discussed below,

Plaintiffs' Motion for Summary Judgment (Dkt. 99) is granted in part and denied in part, and

Defendants' Motion for Summary Judgment (Dkt. 111) is granted in part and denied in part.

---

[1] On December 21, 2023, counsel for Plaintiffs notified the Court of Plaintiff Walsh's death in March 2022. (Dkt. 133). Because a class was certified in September 2021, (Dkt. 124), Plaintiffs contend that Walsh's death does not affect the ultimate resolution of the pending motions for summary judgment or the claims for injunctive relief on behalf of the class. The Court agrees. *See Payton v. Cnty. of Kane*, 308 F.3d 673, 680 (7th Cir. 2002) ("[O]nce a class is properly certified, statutory and Article III standing requirements must be assessed with reference to the class as a whole, not simply with reference to the individual named plaintiffs."); *Johnson v. Midland Career Inst.*, No. 93 C 1363, 1996 WL 54187, at *3 (N.D. Ill. Feb. 8, 1996) ("Once certified, the class has a legal status and standing of its own."). Even though the class certification order states that Plaintiffs Hinton, Mitchell, and Hill are appointed as class representatives, Walsh was also deemed an appropriate class representative. (Dkt. 124 at 9). Accordingly, the Court proceeds with considering the merits of the claims on behalf of the class and apologizes for the extended delay in resolving these motions after the case was reassigned to Judge Hunt on June 2, 2023. (Dkt. 131).

## BACKGROUND

The facts are taken from the parties' Local Rule 56.1 statements.[2] Plaintiff Derek Walsh was a pretrial detainee in the WCADF from June 25, 2013, to April 8, 2020. (DRPSOF[3] ¶ 1). When Plaintiffs moved for summary judgment, he was on bond awaiting trial on a criminal case, *id.*, but as previously indicated, Plaintiff Walsh is now deceased. Plaintiff Shane Mitchell was a pretrial detainee in the WCADF from March 23, 2019, to April 3, 2020. (*Id.* ¶ 2). In 2021, he was on bond awaiting trial on a criminal case. (*Id.*). Plaintiff Brian Engelsman was a pretrial detainee in the WCADF from March 11, 2018, to August 9, 2019. (*Id.* ¶ 3). In 2021, he was imprisoned in the Illinois Department of Corrections at Pinckneyville Correctional Center. (*Id.*). Plaintiff Terrell Hill was a pretrial detainee in the WCADF from November 19, 2018, to August 21, 2020. (*Id.* ¶ 4). In 2021, he was imprisoned in the Illinois Department of Corrections at Hill Correctional Center. (*Id.*). Plaintiff William Hinton had been a pretrial detainee in the WCADF since January 2014. (*Id.* ¶ 5).

Defendant Mike Kelley was the Sheriff of Will County, Illinois. (*Id.* ¶ 6). The County itself is also named as a Defendant. (*Id.* ¶ 7).

Plaintiffs sued Defendants under 42 U.S.C. § 1983, the First Amendment, and RLUIPA, on behalf of themselves and a class of similarly situated detainees for "promulgat[ing] and enforce[ing] constitutionally defective policies at the [WCADF] which restrict detainees' access

---

[2] The Court recognizes that these motions were filed in early 2021, and thus, some details may have changed since then. But other than the death of Plaintiff Walsh, neither side has advised the Court of any other salient updates that would materially impact the analysis here.

[3] Defendants' Response to Plaintiffs' L.R. 56.1 Statement of Undisputed Material Facts and Statement of Additional Facts, Dkt. 111-6.

to reading materials and their ability to communicate with individuals outside of the jail." (TAC[4] ¶ 2). In the TAC, they seek injunctive relief, a declaratory judgment, and nominal damages.

On September 29, 2021, the Court[5] certified a class consisting of "[a]ll individuals presently or in the future detained in the [WCADF] . . . who are subjected to the restrictions on reading materials and unreasonable delays in their incoming and outgoing mail challenged in Plaintiffs' [TAC]." (Dkt. 124).

In their present motion for summary judgment, Plaintiffs challenge three WCADF policies:

1. A ban on photographs or other materials that are determined to contain sexual or other inappropriate content at the discretion of mailroom staff ("Sexual or Inappropriate Content Policy");

2. A ban on all material printed from the Internet, media articles, or pages torn from books or magazines ("Media Policy"); and

3. A ban on any mail to or from a person, publisher, or business whose return address is a P.O. Box, regardless of its contents and regardless of the identity of the sender ("P.O. Box Policy").[6]

(Pls.' Mot. Summ. J. at 6, Dkt. 99). Defendants generally concede the existence of these policies but dispute Plaintiffs' contention that they refuse to deliver detainee mailings to P.O. Boxes. (DRPSOF ¶¶ 14, 28, 42, 51-52). Defendants also seek summary judgment in their favor as to the constitutionality of the WCADF policies and their compliance with RLUIPA. (Dkt. 110-111). The cross-motions are fully briefed and ripe for resolution.

---

[4] Third Amended Complaint, Dkt. 50.

[5] This case was previously assigned to District Judge Andrea Wood.

[6] Plaintiffs' TAC also alleges that Defendants promulgated and enforced a policy which led to "[u]nreasonable delays in processing incoming and outgoing mail to and from prisoners at the jail." (TAC ¶ 2). But neither party moved for summary judgment on the mail delay policy.

**LEGAL STANDARD**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" and "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "On summary judgment, inferences as to disputed issues of material fact are drawn against the moving party, but 'inferences as to disputed matters of professional judgment are governed by *Overton*, which mandates deference to the views of prison authorities.'" *Montoya v. Jeffreys*, 565 F. Supp. 3d 1045, 1061 (N.D. Ill. 2021) (quoting *Singer v. Raemisch,* 593 F.3d 529, 534 (7th Cir. 2010).

**DISCUSSION**

Defendants argue that each challenged policy is valid, proper, and necessary for the safe operation of the WCADF, and thus constitutional. In addition, Defendants contend that this lawsuit is not properly before the Court because there is no live controversy. Plaintiffs, on the other hand, maintain that Defendants' interest in security and order is not sufficient to uphold such broad restrictions on detainees' First Amendment rights. Plaintiffs further assert that the P.O. Box Policy, as applied to mail to and from religious organizations, violates the RLUIPA. Having considered the arguments of the parties and the applicable law, the Court finds that Plaintiffs' claims are justiciable, the Sexual and Inappropriate Content Policy is constitutional, but the Media Policy and the P.O. Box Policy are unconstitutional.

**I.     Justiciability**

Before considering the merits of Plaintiffs' claims, the Court first addresses Defendants' argument that relief is unavailable to Plaintiffs because the claims of the four named un-detained

Plaintiffs are moot, and the fifth named detained plaintiff lacks standing. "Article III, § 2 of the Constitution limits the jurisdiction of federal courts to 'Cases' or 'Controversies.'" *Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of City of Milwaukee*, 708 F.3d 921, 926 (7th Cir. 2013) (quoting *Arizonans for Off. Eng. v. Ariz.*, 520 U.S. 43, 64 (1997)). "As such, federal courts are prohibited from rendering advisory opinions; they cannot divine on 'abstract dispute[s] about the law.'" *Id*. (quoting *Alvarez v. Smith*, 558 U.S. 87, 130 (2009)). This restriction is implemented in the principles of justiciability, including standing and mootness. *Id*.; *Protestant Mem'l Med. Ctr., Inc. v. Maram*, 471 F.3d 724, 729 (7th Cir. 2006). "At all stages of litigation, a plaintiff must maintain a personal interest in the dispute. The doctrine of standing generally assesses whether that interest exists at the outset, while the doctrine of mootness considers whether it exists throughout the proceedings." *Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021).

### A.  <u>Un-detained Plaintiffs</u>

Mootness has been described as "standing set in a time frame," *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 189 (2000), with the inquiry being whether a party retains his "personal stake" in the case even after litigation commences. *Loertscher v. Anderson*, 893 F.3d 386, 392 (7th Cir. 2018). "If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013) (internal quotations omitted).

Defendants argue that because four of the named Plaintiffs—Walsh, Mitchell, Engelsman, and Hill—are no longer detained at the WCADF, their claims are moot. Plaintiffs counter that they filed the operative complaint and motion for class certification while all five named Plaintiffs had live claims for injunctive relief and thus they can continue to represent the class under the

"inherently transitory" exception to the mootness doctrine. Furthermore, Plaintiffs contend, their requests for declaratory relief and nominal damages remain justiciable, and the claims of Plaintiffs Walsh[7] and Mitchell, who are on bond, are not moot because their liberty is conditional.

The inherently transitory doctrine applies in class actions where "the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires." *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991) (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 399 (1980)). District Judge Wood determined in September 2021—after these motions were fully briefed—in her order granting class certification that the doctrine applies here. (Dkt. 134). She reasoned that the named Plaintiffs were appropriate and adequate class representatives even though they were no longer imprisoned at WCADF "because pretrial detention is inherently transitory." (*Id.* at 8). "And because prisoners at the WCADF remain subject to the challenged policies, the class as a whole holds a continuing live claim." (*Id.*). This Court concurs with that analysis and finds Plaintiffs' claims for injunctive relief are not moot.

Furthermore, the Court agrees that individuals who are no longer detained at the WCADF retain an ongoing interest in their claims for declaratory relief and nominal damages. In *Koger v. Dart*, an individual plaintiff challenged the jail's ban on newspapers. 114 F. Supp. 3d 572, 575 (N.D. Ill. 2015). There, the court found that although plaintiff's individual request for injunctive relief was moot because he was no longer incarcerated at the jail, his request for nominal damages and declaratory judgment survived. *Id.* at 576-577; *see also Crue v. Aiken*, 370 F.3d 668, 677 (7th Cir. 2004) ("When a claim for injunctive relief is barred but a claim for damages remains, a

---

[7] Although Plaintiff Walsh has died, the argument still applies to Plaintiff Mitchell and other class members.

declaratory judgment as a predicate to a damages award can survive."). Accordingly, Plaintiffs'

claims for declaratory relief and nominal damages can still proceed.

Finally, as Judge Wood found, Plaintiff Mitchell (and others on bond) continue to have

standing to assert claims for injunctive relief where bond could be revoked thereby subjecting them

to WCADF policies again. (Dkt. 134 at 8-9, citing *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)).

For all those reasons, these Plaintiffs' claims are not moot.

### B. Detained Plaintiff Hinton

To establish standing, a plaintiff must prove three elements: (1) injury in fact, (2) causal

connection between the injury and the conduct forming the basis of the complaint, and

(3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Defendants argue

that Plaintiff Hinton lacks standing because notwithstanding his detention in the WCADF, he has

failed to establish injury in fact. Plaintiffs contend that Hinton has presented evidence that he is

subject to the challenged policies and has suffered a loss of First Amendment freedoms as a result.

Plaintiff Hinton submitted a declaration in support of summary judgment, stating:

> It is hard to know what is going on in the news, especially news in the
> community. . . . I would like to receive the *Daily Herald* newspaper so I can stay
> up to date on local news and what is happening in the community, including local
> sports teams. . . . I have never been able to receive the Joliet *Daily Herald* or any
> articles from that newspaper. . . . I also tried to receive magazines while at the Jail.
> In particular, I tried to subscribe to *Jet* magazine, a weekly culture and
> entertainment magazine focused on African-American culture. I have never been
> allowed to receive this magazine.

(Decl. of William L. Hinton ¶¶ 3-4, Dkt. No. 101-7).

Defendants argue that Plaintiff Hinton's "issues" as described in his declaration are "a

matter of personal convenience rather than an actual or imminent injury," (Defs.' Reply at 4, Dkt.

116), and further point to the fact that Hinton can receive USA Today, a national newspaper.

Contrary to Defendants' position, the Supreme Court has recognized inmate access to newspapers,

magazines, and photographs as an important constitutional interest. *See Beard v. Banks*, 548 U.S. 521, 525 (2006). Having one copy of a national newspaper available to be shared among *all* WCADF inmates that also does not provide news relevant to his local community, does not relieve Plaintiff Hinton's injury.

Moreover, while Defendants maintain that Hinton receives mail and sends mail, so he can raise no First Amendment claims, Hinton avers otherwise:

> My incoming and outgoing mail have been greatly delayed. In my experience, it takes, on average, three or more weeks for outgoing mail to actually be postmarked from the time I try to send it out of the Jail. This makes it hard for me to participate in my own defense in my criminal case. For example, I have tried to obtain relevant transcripts from my criminal case. I have never received the transcripts and I don't know whether my mail ever reached the court.

(Hinton Decl. ¶ 5, Dkt. No. 101-7). As a current WCADF detainee subject to its policies, Hinton has alleged an injury to his First Amendment rights sufficient to establish standing.

## II.    Constitutionality of WCADF Policies

With standing resolved, the Court considers the merits of Plaintiffs' claims. The Supreme Court has explained that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). The First Amendment is no exception to that rule. *See Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989) (recognizing prisoners have protected First Amendment rights); *King v. Fed. Bureau of Prisons*, 415 F.3d 634, 638 (7th Cir. 2005) ("Freedom of speech is not merely freedom to speak; it is also freedom to read."). This extends to prisoners' constitutionally protected interest in sending and receiving mail. *Van den Bosch v. Raemisch*, 658 F.3d 778, 785 (7th Cir. 2011). Nevertheless, prison officials may

impose restrictions on such interests that "are reasonably related to legitimate penological interests." *Id.* (internal quotations omitted).

In *Turner*, the Supreme Court articulated four factors to guide courts when assessing the reasonableness of restrictive prison regulations. 482 U.S. at 89-91. The goal is to fix "the correct balance between prisoners' constitutional rights and the need for deference to prison administrators." *Gray v. Cannon*, 974 F. Supp. 2d 1150, 1159 (N.D. Ill. 2013). Those *Turner* factors are: "(1) the validity and rationality of the connection between a legitimate and neutral government objective and the restriction; (2) whether the prison leaves open 'alternative means of exercising' the restricted right; (3) the restriction's bearing on the guards, other inmates, and the allocation of prison resources; and (4) the existence of alternatives suggesting that the prison exaggerates its concerns." *Munson v. Gaetz*, 673 F.3d 630, 633 (7th Cir. 2012) (citing *Turner*, 482 U.S. at 89-91). "The four factors are all important, but the first one can act as a threshold factor regardless which way it cuts." *Singer*, 593 F.3d at 534 (citing *Turner*, 482 U.S. at 89-90). "When challenging the reasonableness of the prison's regulation, the inmate bears the burden of persuasion." *Jackson v. Frank*, 509 F.3d 389, 391 (7th Cir. 2007).

Below the Court applies the *Turner* test to each of the challenged policies.

### A.     Sexual or Other Inappropriate Content Policy

The Sexual or Inappropriate Content Policy is set forth in three places. First, the WCADF Mail Procedures Policy in the Inmate Handbook prohibits detainees from receiving or possessing "[a]ny mail containing . . . sexual or other inappropriate content that may jeopardize the order and security of the Facility." (DRPSOF ¶ 14). Second, the WCADF Policy and Procedure Manual describes "pictures of a nude or semi-nude nature" as "contraband." (*Id.* ¶ 15). And third, the WCADF Mail Denial Notification form allows mailroom staff to check a box that reads

"nude/semi-nude or inappropriate photographs" as a reason for denial of mail. (*Id.* ¶ 16). The jail policies do not define the terms "sexual," "inappropriate," "nude," or "semi-nude" in writing. (*Id.* ¶ 17). Nor has the jail identified any unwritten policies that constrain mail-room staffs' discretion to deny material they deem "inappropriate." (*Id.*). Defendants' rationale for the policy is security reasons as sexual or inappropriate material may be and has been used a "currency" in the facility causing disorder. (PRDSOF[8] ¶ 10).

The parties agree that Plaintiffs have been denied certain items pursuant to this policy. Where they diverge is on whether the items that were denied contained sexual or inappropriate content. For example, Plaintiff Walsh was denied photos of his partner that were deemed inappropriate because the individual portrayed was not fully clothed. (DRPSOF ¶ 21). He was also denied a book titled *The History of Tattoos and Body Modifications* that the jail concluded contained sexually explicit content. (*Id*. ¶ 25). Walsh disagreed with those decisions.

### 1. <u>Rational Connection Between Regulation and Government Interest</u>

"[A]s the Seventh Circuit has explained, analysis under [the first] factor requires consideration of 'whether the governmental objective underlying the policy is (1) legitimate, (2) neutral, and (3) whether the policy is rationally related to that objective.'" *Gray*, 974 F. Supp. 2d at 1159 (quoting *Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir. 1999)). Plaintiffs argue that the policy fails the first factor for two reasons: (1) the "inappropriateness" standard is too subjective to satisfy the neutrality competent of the first factor and (2) the policy is not connected to a legitimate penological interest. As discussed below, the Court finds that the policy is connected to a legitimate interest and is neutral as defined by *Turner*.

---

[8] Plaintiffs' Response to Defendants' Statement of Material Facts, Dkt. 113.

Defendants' undisputed rationale for this policy is security, particularly preventing pictures depicting nude/semi-nude images from being used as "currency" at WCADF and causing disorder. Plaintiffs argue that Defendants have not connected the policy to a legitimate interest because Defendants have not identified specific aspects of safety or security that would be compromised if inappropriate content were allowed into the facility. Plaintiffs contend that without this evidence, Defendants' rationale amounts to nothing more than conclusory assertions. Plaintiffs are correct that "[t]o demonstrate the rational relationship, the state must 'show more than a formalistic logical connection between a regulation and [its institutional] objective.'" *Brown v. Phillips*, 801 F.3d 849, 854 (7th Cir. 2015) (quoting *Beard*, 548 U.S. at 535). "Rather, [the state] must present 'some evidence to show that the restriction is justified.'" *Id*. (quoting *King*, 415 F.3d at 639).

Plaintiffs rely on *Brown* in support of their argument, but that case actually supports Defendants' position. In *Brown*, a prisoner convicted of sexually violent offenses challenged policies that restricted his access to R-rated movies, M-rated video games, and internet connected video game consoles. 801 F.3d at 851-52. Regarding the movie and video game ban, the defendants argued that "common sense" justified prohibiting sex offenders from viewing sexually explicit materials. *Id.* at 854. The Seventh Circuit disagreed, explaining that some data was needed to connect the goal of reducing the recidivism of sex offenders with a ban on their possessing legal adult pornography. *Id*. As to the console ban, the record contained evidence that the policy bore a rational relationship to the facility's interest in security, as the consoles allowed detainees to contact victims of their crimes and access illegal pornography. *Id.* at 855. Because that ban indisputably advanced the state's interest in protecting the public and preventing crime, summary judgment on that claim was appropriate. *Id.*

Likewise, there is unrebutted evidence in the record that the WCADF policy is tied to its security goal of preventing inappropriate materials from being used as currency. First, Plaintiffs do not dispute that any item of value (including sexual or other inappropriate content) could be exchanged among inmates. (PRDSOF ¶ 10). Second, Defendants provided an affidavit from Stuart Taylor, Deputy Chief of Operation for the Adult Division of the WCADF, confirming that "sexual or inappropriate material, which may include picture depicting nude/semi-nude images may be and has been used as 'currency' in the [WCADF] causing disorder." (Affidavit of Stuart Taylor ¶ 8, Dkt. 111-2). Plaintiffs have not pointed to anything in the record to contradict these points. Accordingly, Defendants have demonstrated a legitimate government interest.

Next, Plaintiffs argue that the policy is not neutral because it gives staff unconstrained discretion to censor mail on the basis that it is inappropriate. But the reference to "neutrality" in *Turner* was intended to go no further than the requirement that the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. *Gray*, 974 F. Supp. 2d at 1159 (quoting *Thornburg*, 490 U.S. at 415). In other words, "[a]n objective is 'content-neutral' so long as its ultimate purpose is not the suppression of speech." *Pearson v. Berge*, No. 01 C 0364, 2002 WL 32341701, at *3 (W.D. Wis. Aug. 27, 2002) (citing *Mauro*, 188 F.3d at 1059). "For example, regulations that distinguish 'between publications solely on the basis of their potential implications for prison security' are neutral in the relevant sense." *Burlet v. Baldwin*, 452 F. Supp. 3d 801, 809 (N.D. Ill. 2020) (quoting *Thornburgh*, 490 U.S. at 415). However, "[p]ractices that invite the suppression of inflammatory political, racial, religious or other views and matter deemed defamatory or otherwise inappropriate" are not neutral. *Id.* (citing *Martinez*, 416 U.S. at 415) (internal quotations omitted).

12

In *Gray*, the court upheld a policy that prohibited officers from accepting "any publications that he or she finds to contain material determined to be: 1) Obscene; [or] 2) Detrimental to security, good order, rehabilitation, or discipline or if it might facilitate criminal activity, or be detrimental to mental health needs of an offender as determined by a mental health professional." 974 F. Supp. 2d at 1153. Such a policy furthered a neutral interest in "security, good order, or discipline." *Id.* at 1159.

The instant policy is similar to *Gray*. While Plaintiffs focus mainly on the language prohibiting "sexual or other inappropriate content," they gloss over the full text of the relevant provision in the Mail Procedures Policy of the Inmate Handbook, which states that "Any mail containing gang signs, symbols, initials or graffiti, maps, sexual or other inappropriate content *that may jeopardize the order and security of the facility* will be confiscated." (emphasis added). As in *Gray*, materials are withheld under the policy not for the purpose of suppressing speech, but to maintain the "order and security" of the WCADF. "Where, as here, prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' in the technical sense in which we meant and used that term in *Turner*." *Thornburgh*, 490 U.S. at 416. Defendants have therefore demonstrated a neutral government interest.

As such, the first *Turner* factor is satisfied.

### 2. **Alternative Means to Exercise the Burdened Right**

"The lack of alternative means for exercising the right is evidence that the regulation is unreasonable." *Koger*, 114 F. Supp. 3d at 580 (citing *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003)). The right in question must be viewed "sensibly and expansively" and it is sufficient if other means of expression remain available. *Gray*, 974 F. Supp. 2d at 1160 (citing *Thornburgh*,

490 U.S. at 417). "Where 'other avenues' remain available for the exercise of the asserted right, the courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation." *Singer*, 593 F.3d at 539 (citing *Turner,* 482 U.S. at 90).

Plaintiffs argue that no alternative means are available to access a specific item if it is deemed inappropriate. In response, Defendants contend that inmates are not prohibited from receiving all materials – only those that are sexual and inappropriate in nature. "Viewed 'expansively,' the right at issue here is Plaintiffs' First Amendment right to receive and read a range of [materials] so that they are not 'shut . . . out of the marketplace of ideas and opinions that it is the purpose of the free-speech clause to protect.'" *Gray*, 974 F. Supp. 2d at 1160 (quoting *King*, 415 F.3d at 638). Under the challenged policy, Plaintiffs are still permitted to access a broad range of publications. Accordingly, the second *Turner* factor is satisfied. *See Thornburgh*, 490 U.S. at 417.

### 3. Impact on Prison Resources and Alternatives

The third and fourth *Turner* factors are often intertwined. *Koger*, 114 F. Supp. 3d at 581. The third factor considers the restriction's bearing on the guards, other inmates, and the allocation of prison resources, while the fourth factor considers the existence of alternatives. *Munson*, 673 F.3d at 633 (citing *Turner*, 482 U.S. at 89-91). "[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Gray*, 974 F. Supp. 2d at 1160-61 (quoting *Turner,* 482 U.S. at 91).

Here, Plaintiffs suggests that the WCADF could adopt a policy which clearly defines and limits what is meant by "inappropriate." While that may be true, a regulation does not need to

satisfy a "least restrictive alternative test." *Jackson*, 509 F.3d at 392 (quoting *Turner*, 482 U.S. at 90-91, 107). "[P]rison officials do not have to set up and shoot down every conceivable alternative method of accommodating [Plaintiff's] constitutional complaint." *Turner*, 482 U.S. at 90-91); *see also Van den Bosch*, 658 F.3d at 790 ("While the [facilities'] asserted penological objectives— maintaining prison security, order and rehabilitation—might very well be achieved with a narrower policy, the absence of an ideal policy does not render the policy that officials have adopted unconstitutional.").

Defendants counter that if this policy were not in place, additional staff and guards would be required to protect against the potential distribution of sexual or pornographic photos or the dangers that may result when inmates learn about each other's personal beliefs. As Plaintiffs point out, Defendants' argument is somewhat misplaced, given that Plaintiffs do not contend that pornographic materials must be allowed without limitation. Still, "[c]ourts are to accord 'substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them.'" *Van den Bosch*, 658 F.3d at 786 (quoting *Overton*, 539 U.S. at 132). Here, as already noted, Plaintiffs do not dispute that prohibited materials may be used as currency in the facility and cause disorder. Given the deference that prison administrators enjoy, the Court concludes that the third and fourth factors of the *Turner* test favor Defendants.

In sum, because each *Turner* factor favors Defendants, the Court finds the Sexual and Inappropriate Content Policy constitutional. Summary judgment is therefore granted in favor of Defendants and against Plaintiffs as to this policy.

### B. **Media Policy**

The Media Policy is set forth in the WCADF Inmate Handbook and provides as follows: "You cannot receive any printed material from the Internet, media articles, or pages torn from books or magazines." (DRPSOF ¶ 28). Defendants' rationale for the policy is security reasons to prevent detainees from receiving information about other inmates' cases, victims, other detainees' partners, or gangs and gang activity because such information would likely circulate the facility causing potential disruptive conduct and violence. (PRDSOF ¶ 8). Additionally, the information could allow detainees to draw inferences about other detainees' beliefs, sexual orientation, or gang affiliations and cause disorder. (*Id.* ¶ 8).

It is undisputed that Plaintiffs and other inmates have been denied mail solely because it contained material printed from the internet. For example, Plaintiff Walsh was denied a printout of get-well messages and other sympathetic reactions that friends posted on Facebook after his son broke his leg. (DRPSOF ¶ 33). Plaintiffs contend that there is no security or administrative interests served by this "extraordinary broad ban" on all media articles and materials printed from the internet. (Pls.' Mot. Summ. J. at 21).

#### 1. **Rational Connection Between Regulation and Government Interest**

The Seventh Circuit and other courts in this district have considered the constitutionality of such categorical bans. For example, in *Lindell v. Frank*, the plaintiff challenged a policy that restricted inmates to receiving published materials from a publisher or other commercial source, as it prevented him from receiving clippings of published articles. 377 F.3d 655, 659 (7th Cir. 2004). While the Court of Appeals ultimately held the policy was unconstitutional, it agreed that

the defendants had a legitimate security interest in screening for hidden messages and economic interest in saving staff resources. *Id*.

Similarly, in *Koger*, the plaintiff challenged a policy that prohibited him from receiving newspapers. 114 F.Supp.3d at 575-76. The defendants asserted several rationales for the ban, including that newspapers could cause violence as inmates may learn about the nature of other inmates' charges or outside gang activity. *Id*. at 580. Again, while that court ultimately found the policy unconstitutional, the ban itself was rationally related to the jail's legitimate interest in maintaining security. *Id*.

Here, as with *Lindell* and *Koger*, the Court finds the asserted policy rationale is rationally connected to jail security and thus satisfies the first *Turner* factor. *See also Littler v. Wallace*, 803 F. App'x 15, 19 (7th Cir. 2020) ("Prison security is a sufficiently important government interest to justify limitations on First Amendment rights."); *Pell v. Procunier,* 417 U.S. 817, 823 (1974) (maintaining the internal security of a prison is "central to all other corrections goals.").

## 2. **Alternative Means to Exercise the Burdened Right**

As to the portion of the policy which prohibits inmates from receiving material printed from the internet, Defendants contend that detainees can "access content from websites that do not have a specific URL" or access information during the research time allotted to them. (Defs.' Resp. at 8, Dkt. 110). However, Defendants have not provided any evidence in support of these alleged alternatives. For example, Defendants have not stated the amount of time inmates are allotted for research or offered examples of internet material without a special URL that was allowed to be admitted. The Supreme Court has recognized that banning mail that includes internet media amounts to keeping detainees from accessing "the world of ideas" and "explor[ing] the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017).

As to the portion of the policy which prohibits inmates from receiving media articles and pages torn from books and magazines, Defendants suggest that inmates have access to a single copy of USA Today or the option to subscribe to full national newspapers as alternatives. The Court disagrees that these are reasonable option. In *Lindell*, the Seventh Circuit found that the plaintiff did not have an alternative means of exercising his rights where defendant's policy prohibited him from receiving clippings or photocopies of published articles. 377 F.3d at 659. In its ruling, the court emphasized that "subscriptions are not fully equivalent to clippings because subscribing requires inmates to anticipate which papers might have articles that they like to read and to subscribe to all such papers." *Id.* (internal quotations omitted). The same problem arises here. Because there are no alternative means for detainees to access internet materials and media articles, the policy fails the second *Turner* factor.

### 3.  Impact on Prison Resources and Alternatives

Taking the third and fourth *Turner* test factors together, the Court believes Plaintiffs' rights can be accommodated by alternatives that do not negatively impact WCADF resources. "[A]lthough the regulation need not satisfy a least restrictive alternatives test, the existence of obvious alternatives may be evidence that the regulation is not reasonable." *Shimer v. Washington*, 100 F.3d 506, 509 (7th Cir. 1996). Here, Plaintiffs raise the most obvious alternative: having WCADF staff review mail containing internet materials and media clippings as it does for all other correspondence sent to detainees. Through this process, mailroom staff could intercept content that poses security risks—such as articles concerning victims or other detainees—rather than get well messages to a detainee's son.

Though Defendants argue that this alternative would require more staffing and time to meticulously review and research all incoming mail, Defendants' policies themselves state that

WCADF staff already does so. Jails already engaged in this type of review do not necessarily experience a heightened burden on their resources by having to review other content. *See Koger*, 114 F. Supp. 3d at 583. WCADF also has the option of limiting the amount of mail detainees receive over a certain period of time, offering Defendants another alternative to categorical exclusion of correspondence that poses no risk. For these reasons, the media policy fails the third and fourth factors of the *Turner* test.

In sum, although the first *Turner* factor is satisfied, the Court finds the Media Policy falls short on the remaining three factors and is unconstitutional. Summary judgment is therefore granted in favor of Plaintiffs and against Defendants as to this policy.

### C.  P.O. Box Policy

The P.O. Box Policy is set forth in the WCADF Inmate Handbook. Specifically, the handbook provides that "Media delivered from a PO Box will be returned to sender." (DRPSOF ¶ 42). Defendants contend that not being able to identify a sender creates security concerns, and if mail from a P.O. Box has a sender identified, but not a mailing address, significant time and resources would be required to confirm the sender. (PRDSOF ¶ 2). As with the other policies, it is undisputed that Plaintiffs and other detainees were denied mail from Zen Mountain Monastery, a newsletter from Compassion Works for All, periodicals from Prison Legal News, and a list of resources for prisoners from Transmission Prison Project, because the entities listed P.O. Boxes as their return addresses.  (*Id.* ¶¶ 44, 46-52).

Additionally, Plaintiffs contend that WCADF also refuses to deliver outgoing mail to P.O. Boxes. (DRPSOF ¶¶ 45, 51-52). Defendants, however, disagree and maintain that there is no ban or regulation that restricts detainees from sending mail to P.O. Boxes. (PRDSOF ¶ 8).

19

1. **Incoming Mail**

    a. **Rational Connection Between Regulation and Government Interest**

As to the P.O. Box Policy, Defendants assert "security concerns" with unidentified senders as their legitimate and neutral governmental objective. (PRDSOF ¶ 2.). But, as Plaintiffs' point out, the policy bans much more than just unidentifiable mail correspondence. (DRPSOF ¶¶ 44, 46, 48-49, 54-58). Instead, the WCADF policy has denied Plaintiffs' mail from known senders, including religious organizations, prisoner advocacy and resource groups, and publishers discussing spirituality. (*Id.*). Not only was mail like this identifiable to Defendants (as they concede), (*id.* ¶¶ 54-58), but also none of it appears to have posed a single security concern in line with their stated governmental objective. In this way, the type of materials WCADF has denied Plaintiffs as a result of the policy is a strong indicator of the lack of rational connection between the policy and its objectives. *See Riker v. Lemmon*, 798 F.3d 546, 553 (7th Cir. 2015) ("A regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational."); *see also Turner*, 482 U.S. at 98 (finding that marriage restriction was not reasonably related to articulated goal where "the rule [swept] much more broadly than can be explained by petitioners' penological objectives.").

In conclusory fashion, Defendants state "[i]t is rational for a jail to exclude materials that, although not necessarily likely to lead to violence, are determined by the jail to create an intolerable risk of disorder under the conditions of a particular prison at a particular time." (Defs.' Resp. at 7). However, officials must "present some evidence to show that the restriction is justified." *King*, 415 F.3d at 639. Defendants have failed to do that here. Without knowing more about the "security concerns" that mail from P.O. Boxes might pose, or about how having a street address on the

correspondence alleviates these concerns, the Court cannot draw a reasonable connection between this policy and the objective. Accordingly, the first *Turner* factor is not satisfied.

### b. Alternative Means to Exercise the Burdened Right

As to the second *Turner* factor, Defendants argue that alternative means remain open to Plaintiffs because they can receive any incoming mail that is from an identifiable address. In response, Plaintiffs argue that "not all 'mail' is interchangeable," so the fact that they can communicate with individuals with a street address is not an alternative means for exercising their right. (Pls.' Reply at 31, Dkt. 112). However, "[t]he alternatives need not be ideal to the plaintiffs for them to be adequately satisfy the concerns raised by the second *Turner* factor." *Gray*, 974 F.Supp.2d at 1160.

In *Turner*, the Court considered the constitutionality of a regulation which prohibited inmate-to-inmate correspondence. 482 U.S. at 91. The Court found that the regulation did not "deprive prisoners of all means of expression." *Id*. at 92. "Rather, it bars communication only with a limited class of other people with whom prison officials have particular cause to be concerned." *Id*. Such is the case here. Plaintiffs are not barred from receiving all mail—only mail that comes from P.O. Boxes. Accordingly, the second *Turner* factor favors Defendants.

### c. Impact on Prison Resources and Alternatives

As with the Media Policy, Plaintiffs point to the alternative of having WCADF staff review all mail, including correspondence from P.O. Boxes. Defendants contend that any alternative would require WCADF staff to research all P.O. Box senders to verify valid institutions and individuals, which would require additional staffing and time. However, as discussed *supra*, courts have found that jails already engaged in this type of review do not experience a heightened burden on their resources by having to review other content. Reviewing all mail—as WCADF staff does

21

(DRPSOF ¶ 41)—inclusive of P.O. Box correspondence would allow the jail to intercept content that poses security concerns, instead of information, for example, on Zen meditation from Buddhist temples. (*Id.* ¶ 44). Though not raised by Plaintiffs, Defendants could also have staff screen all mail but deny correspondence that does not have an ascertainable sender. Under WCADF's current policy, Plaintiff's P.O. Box mail is denied even when it comes from identifiable senders. (*Id.* ¶¶ 54-58). Accordingly, the policy fails to satisfy the third and fourth factors of the *Turner* test.

In sum, although the second *Turner* factor is satisfied, the Court finds the P.O. Box Policy, at least as applied to incoming mail, falls short on the remaining three factors and is unconstitutional. Summary judgment is therefore granted in favor of Plaintiffs and against Defendants as to this policy.

### 2. **Outgoing Mail**

Plaintiffs contend that although the P.O. Box Policy references only incoming mail, Defendants also prohibit outgoing mail to P.O. Boxes. As noted, Defendants "dispute[] that mailroom staff has ever refused to deliver correspondence from [Plaintiffs] to a P.O. Box." (DRPSOF ¶ 45, 51-52; Defs.' MSJ, Exs. 1-2 ¶ 11, Dkt. Nos. 111-1, 111-2; PRDSOF ¶ 8).

To prevail on summary judgment, Plaintiffs must first prove a jail regulation exists as to outgoing mail, which they have not. Viewing the facts in the light most favorable to Defendants as non-movants, the Court finds a genuine dispute of material fact remains on this point such that summary judgment is not appropriate.[9] *See Hendrix v. Evans*, 715 F. Supp. 897, 909 (N.D. Ind.

---

[9] Plaintiffs refer to Defendants' Aug. 2, 2018 Mail Denial Notification to Plaintiff Walsh, which shows Defendants refused to deliver Walsh's mail "to Liberation Prison Project" at their P.O. Box. (Pls. Reply at 27). The reason provided is that "all mail received from P.O. Box address not permitted," even though Walsh's correspondence was outgoing. (Pls. Mot. Summ. J., App. at 9, Dkt. 101-3). Plaintiffs argue that Defendants' documents confirm that WCADF has a policy banning detainee mail to P.O. Boxes, but Defendants' failure to address this document—as opposed to the larger assertion that WCADF has such a policy—does not establish as an undisputed fact that such a policy exists. To the contrary, Defendants provided affidavits from Will County Sheriff's office mail clerk, Dawn Mau, and Deputy Chief of Operations Taylor, asserting the opposite. (Defs.' Mot. Summ. J., Exs. 1-2 ¶ 11, Dkt. Nos.

1989), aff'd, 972 F.2d 351 (7th Cir. 1992) ("Without the benefit of knowing whether such a policy existed then or exists now, this court cannot address the merits of this claim."). Accordingly, Plaintiffs' motion for summary judgment as to outgoing mail under the P.O. Box policy is denied.

## III.  Religious Land Use and Institutionalized Persons Act

Apart from the unreasonable restriction arguments discussed above, Plaintiffs also argue that the P.O. Box policy violates RLUIPA as applied to mail to and from religious organizations. Specifically, they point to various instances where WCADF mailroom staff denied Plaintiffs' attempts to correspond with religious organizations. These allegations focus on Plaintiff Walsh, who is an observant Buddhist, and his efforts to receive religious publications and guidance from organizations Zen Mountain Monastery, Liberation Prison Project, Parallax Press, and Compassion Works for All, that all use P.O. Boxes for their mailing address.[10]

RLUIPA provides greater protection than the First Amendment. *Schlemm v. Wall*, 784 F.3d 362, 363 (7th Cir. 2015). Under the Act, a jail "cannot 'impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless [it] demonstrates that the burden . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Jones v. Carter*, 915 F.3d 1147, 1148-49 (7th Cir. 2019) (quoting 42 U.S.C. § 2000cc-1). RLUIPA defines a religious exercise as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C.A. § 2000cc-5(7)(A). Given the least-restrictive-means standard for

---

111-1, 111-2). Further, even if these statements were deemed undisputed, a single occasion on which mailroom staff denied delivery of mail to a P.O. Box does not make out a global policy.

[10] The Court assumes *arguendo* that Plaintiff Walsh's RLIUPA claim remains viable notwithstanding his death.

RLUIPA violations, whether an imprisoned individual has alternative ways of exercising their religious freedom is not a "relevant consideration." *Holt*, 574 U.S. at 361-62.

A. **Substantial Burden on Religious Exercise**

Plaintiffs argue that the P.O. Box Policy substantially burdened Plaintiff Walsh's religious exercise by making it impossible for him to receive religious publications and obtain spiritual guidance. Pursuant to RLUIPA, the Supreme Court has found that a substantial burden exists when a prison requires an imprisoned individual to "engage in conduct that seriously violates his religious beliefs." *Holt*, 574 U.S. at 361. "Courts are not arbiters of scriptural interpretation, so the test for substantial burden does not ask whether the claimant has correctly interpreted his religious obligations." *West v. Radtke*, 48 F.4th 836, 847 (7th Cir. 2022) (internal citations and quotations omitted).

Here, Plaintiffs contend that Plaintiff Walsh's inability to correspond with religious organizations placed a substantial burden on his religious exercise. Defendants do not dispute that Walsh had "no alternative sources from which [he] could obtain the spiritual guidance he sought." (DRPSOF ¶ 59). Instead, Defendants contend that Plaintiff Walsh's exercise of religion was not substantially burdened because he was not prohibited from obtaining any and all religious mail. Under the First Amendment, "the availability of alternative means of practicing religion is a relevant consideration, but RLUIPA provides greater protection. RLUIPA's 'substantial burden' inquiry asks whether the government has substantially burdened religious exercise . . . not whether the RLUIPA claimant is able to engage in other forms of religious exercise." *Holt*, 574 U.S. at 361-62. Accordingly, the Court concludes that without other resources to communicate with for spiritual guidance, WCADF imposed a substantial burden upon Plaintiff Walsh's religious exercise.

### B. **Least Restrictive Means of Furthering a Compelling Interest**

Moving to the second part of the inquiry, Defendants do not prove a compelling government interest or that its policy is the least restrictive means to further such an interest. Defendants insist that they impose the P.O. Box policy as a result of "security concerns," to save "time and resources," and because the policy is easy to "uniformly appl[y]." (Defs.' Resp. at 7, 13). But these statements do not satisfy Defendants' "burdens of production and persuasion on the compelling-interest and least-restrictive-means defenses." *Schlemm*, 784 F.3d at 365. The standard for RLUIPA violations requires the Court to "look beyond broadly formulated interests," *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726 (2014), and, here, as explained *supra*, Defendants have failed to explain the connection between the P.O. Box policy and security concerns.

For example, although Defendants contend that mail from P.O. Boxes may not indicate whom the sender is (PRDSOF ¶ 2), Defendants also admit that certain senders of Walsh's mail were indeed identifiable (DRPSOF ¶¶ 54, 56, 57) and that some materials excluded by this policy are "not necessarily likely to lead to violence." (Defs.' Resp. at 7). The Supreme Court has, likewise, required more evidence from prisons where they have alleged "safety" generally as a compelling interest. *See, e.g.*, *Holt*, 574 U.S. at 362-63. Further, the Seventh Circuit has found that "[s]aving a few dollars is not a compelling interest." *Schlemm*, 784 F.3d at 365. This is particularly the case here where WCADF staff already screens and reviews all incoming mail before distributing it to detainees. (DRPSOF ¶ 41.)

Without more evidence, Defendants fail to meet their burden of proving a compelling government interest and that their policy is the least restrictive means to further such an interest. As a result, the Court grants summary judgment in favor of Plaintiffs and against Defendants on the RLUIPA claim.

## <u>CONCLUSION</u>

For all the foregoing reasons, summary judgment is (1) granted in favor of Defendants and against Plaintiffs as to the "sexual or inappropriate content" policy; (2) granted in favor of Plaintiffs and against Defendants as to the "media use" policy and the ban on incoming mail from P.O. Boxes; (3) denied as to Plaintiffs and Defendants regarding the alleged ban on outgoing mail to P.O. Boxes; and (4) granted in favor of Plaintiffs and against Defendants as to the RLUIPA claim.

**DATED**: July 15, 2024                                **ENTERED**:

_____
LaShonda A. Hunt
United States District Judge